CONTINENTAL ILLINOIS LEASING CORPORATION *et al.*, Plaintiffs-Appellees, *v.* THE DEPARTMENT OF REVENUE, Defendant-Appellant.

First District (2nd Division)   No. 81—1152

Opinion filed August 10, 1982.—Rehearing denied September 7, 1982.

Tyrone C. Fahner, Attorney General, of Springfield (Paul P. Biebel, Jr., Patricia Rosen, and Ronald P. Stake, Assistant Attorneys General, of counsel), for appellant.

Morgan, Lanoff, Denniston & Madigan, Ltd., of Chicago (Edmund Gronkiewicz and James E. McParland, of counsel), for appellees.

JUSTICE PERLIN delivered the opinion of the court:

Following a hearing before the Illinois Department of Revenue (Department), Continental Illinois Leasing Corporation (Continental) received a final assessment for the period from July 1, 1974, through February 28, 1977, of $195,859.17, including penalty and interest allegedly due under the Illinois Use Tax Act (Ill. Rev. Stat. 1979, ch. 120, par. 439.1 *et seq.*) (Use Tax Act). Continental thereafter filed an administrative review action in the circuit court of Cook County, which court reversed the Department's decision. The Department appeals.

■■ The State of Illinois imposes a tax upon the privilege of using, in this State, tangible personal property purchased at retail from a retailer. (Ill. Rev. Stat. 1979, ch. 120, par. 439.2.) The tax applies whether the property is purchased in Illinois or elsewhere (*Turner v. Wright* (1957), 11 Ill. 2d 161, 142 N.E.2d 84.) The purchaser incurs the primary liability for payment of the tax. (*Klein Town Builders, Inc. v. Department of Revenue* (1966), 36 Ill. 2d 301, 222 N.E.2d 482.) The tax does not apply to property purchased and used by an institution organized or operated exclusively for charitable purposes. Nor does the tax apply to the use of tangible personal property "purchased from an isolated or occasional seller who is not engaged in the business of selling such tangible personal property." (Use Tax Rules 3(6) and 3(2).) The issue presented for our review is whether Continental purchased certain hospital equipment from a retailer in a sale at retail so as to incur use tax liability.

St. Mary of Nazareth Hospital Center (hospital), an Illinois not-for-profit corporation which operates St. Mary of Nazareth Hospital, is the true plaintiff-in-interest in the instant case. Although the use tax was assessed against Continental, the hospital under its contract with Continental is responsible for payment of the tax.

In 1972 the hospital began construction of a new facility. As part of the hospital's financial plan for equipping and furnishing the new

facility, the hospital entered into a "Master Lease Agreement" with Continental on October 20, 1974. This agreement was subsequently amended when on December 16, 1974, Continental and the hospital executed a document entitled "Amended and Restated Master Lease." (Amended lease.)

Under the amended lease, Continental agreed to pay the "acquisition cost" of $3,000,000 worth of "high technology" radiology and radioisotope equipment which was to be selected by the hospital. The term of the lease was to "commence on the date of delivery" of the equipment to the hospital. The lease also provided that:

"10(a)  The equipment shall be the exclusive property of Lessor [Continental] and Lessee [hospital] shall have no rights therein except the right to use it so long as Lessee is not in default hereunder.

*   *   *

10(e)  Lessee shall place and maintain on each unit of equipment a notice conspicuously disclosing Lessor's ownership."

In acquiring the equipment under the amended lease, the hospital negotiated directly with the manufacturers regarding the type of equipment to be purchased and its purchase price. The equipment was delivered to and accepted by the hospital. The hospital agreed to bear the obligation of all taxes imposed as an incident to the equipment purchases. Continental had the right, for tax purposes, to take the investment tax credit and depreciation on the equipment.

The hospital issued a total of 44 purchase orders directly to various manufacturers for all of the equipment ultimately accepted by it under the lease. The purchase orders were issued between September 10, 1973, and May 13, 1975. Subsequent to the execution of the amended lease, the hospital assigned 21 of these purchase orders to Continental. Each assignment provides:

"The undersigned ('Assignor') hereby assigns to Continental Illinois Leasing Corporation ('Assignee') all of the Assignor's right, title and interest in and to the Purchase Orders ***."

The record discloses that Continental made all payments directly to the manufacturers for the full amount of the "acquisition cost" of the equipment. The only payments of record which the hospital made were rental payments to Continental under the amended lease. Although the record does not contain original bills of sale or invoices, it does show that the hospital issued a "Confirmatory Bill of Sale" dated January 1977 to Continental which provided:

"*** in consideration of one dollar and other good and valuable consideration *** does hereby confirm *** that immediately

prior to or simultaneously with the commencement of the term of lease *** dated December 16, 1974 *** [the hospital] sold and assigned to the buyer [Continental] all of its right, title and interest *** to the equipment."

Continental's general ledger indicated that Continental had purchased the equipment from the hospital.

Following an audit, the Department issued to Continental a notice of tax liability based on the determination by the Department's auditor that Continental had purchased the equipment directly from the manufacturers, not from the hospital. Continental protested and requested a hearing, which was granted.

At the Department hearing on August 22, 1978, witnesses for Continental and the hospital testified that the hospital actually purchased the equipment from the retailers, sold it to Continental and then leased it back. According to Richard Pietrzak, the hospital's vice-president of financial management, the payments made by Continental were merely "interim financing." He explained that the equipment delivered to the hospital under the terms of the amended lease was not "accepted" by the hospital until it had been installed, tested and approved. Because of the nature of the equipment, there was a substantial delay between the delivery of the equipment and its final approval by the hospital. The manufacturers, however, required a sizeable down payment upon delivery. Consequently, the agreement between the hospital and Continental obligated Continental to make the down payment to the manufacturers upon their delivery of the equipment to the hospital. Thus, according to Pietrzak, Continental financed the equipment's purchase during the interim period between its delivery and ultimate approval.

The hospital argued that the transactions which led to its acquisition of equipment under the amended lease were exempt from use tax. The hospital contended that its purchase of the equipment from the manufacturers was exempt under the charitable institution exemption and that the subsequent sale by the hospital to Continental was exempt as an occasional sale. The Department relied on the amended lease agreement, the purchase order assignments and the fact that Continental made all payments for the equipment directly to the manufacturers to argue that Continental had purchased the equipment from the manufacturers in a sale at retail. In the alternative, the Department argued that even if it were determined that the hospital had purchased the equipment direct from the manufacturers, the hospital's subsequent sale of such equipment to Continental was not exempt as an occasional sale. Thus, Continental would have incurred

a use tax liability when it purchased the equipment from the hospital.

The hearing referee held that the hospital never acquired title to the equipment and that Continental had purchased it directly from the manufacturers. The referee found that the equipment was "future goods," *i.e.*, not yet manufactured at the time the hospital issued its purchase orders. Under section 2—401(2) of the Uniform Commercial Code (Ill. Rev. Stat. 1979, ch. 26, par. 2—401(2)), title to such goods passes at the time and place at which the seller completes delivery of the goods. The referee also found that delivery of the equipment occurred subsequent to the execution of the amended lease, December 16, 1974. Since the amended lease commenced upon delivery to the hospital and under such lease Continental exercised all powers of ownership, the referee concluded that Continental acquired title direct from the manufacturers upon delivery of the equipment to the hospital. The hearing referee also ruled that even if the hospital had taken title directly from the manufacturers, the hospital's subsequent sale to Continental would have been a sale at retail and not exempt as an occasional sale.

The trial court reversed the ruling of the Department, noting that one of the purchase orders issued by the hospital prior to the execution of the lease indicated that delivery was also to precede the lease date. Based on this single purchase order, the trial court concluded that the equipment had actually been delivered to the hospital prior to the execution of the lease. Accordingly, the trial court agreed that under section 2—401(2) the hospital acquired title direct from the manufacturers and then passed title to Continental in a subsequent sale. The trial court also found that the hospital's sale to Continental was not a sale at retail and hence was exempt from use tax.

Upon appeal, the Department contends that the evidence presented at the Department hearing established that Continental incurred liability for the use tax whether the company purchased the equipment from the manufacturers or from the hospital.

Use Tax Rule 2(3) defines a purchaser as "*** anyone who, through a sale at retail, acquires the ownership of or title to, tangible personal property for a valuable consideration." To determine when, for taxation purposes, ownership of or title to property is transferred, Illinois courts have applied the title passing tests of the Uniform Commercial Code. (See *O'Brien v. Isaacs* (1965), 32 Ill. 2d 105, 203 N.E.2d 890; *United Technical Corp. v. Department of Revenue* (1982), 107 Ill. App. 3d 1062, 438 N.E.2d 535.) Section 2—401(2) of the Uniform Commercial Code provides that "identification to the contract," a necessary prerequisite to the passing of title, occurs in the case of

future goods when goods are shipped, marked, or otherwise set aside, and that unless otherwise explicitly agreed upon, title passes at the time and place at which the seller completes his performance with respect to the delivery of the goods. In the instant case the record shows no explicit agreement regarding the passing of title nor is there any indication that the equipment was "identified to the contract" prior to its delivery. Accordingly, we must conclude that title to the equipment passed from the manufacturers upon its delivery to the hospital. The issue to be determined, therefore, is to whom title passed.

In our opinion the evidence of record does not support the trial court's finding that the equipment had actually been delivered to the hospital prior to December 16, 1974, the date the amended lease was executed. The scheduled delivery dates noted on the purchase order by the trial court are December 31, 1973, and May 31, 1974. There is nothing in the record to indicate, however, that delivery was actually made on either day. Indeed, the record shows that delivery was actually made subsequent to December 16, 1974. This same purchase order provided that 80% of the purchase price was due upon delivery of the equipment to the hospital. Continental made this payment to the manufacturers. Although the precise date of this payment cannot be determined from the record before us, it is clear that Continental was not obligated to make payments to the manufacturers for equipment delivered to the hospital prior to the execution of the amended lease. Consequently, it would appear from the fact that Continental made such payments that delivery to the hospital occurred after the execution of the amended lease.

As heretofore noted, the amended lease provided that upon delivery the equipment became "the exclusive property of [Continental] and [the hospital] had no rights therein except the right to use it." From the date of its delivery Continental exercised the powers incident to ownership of the equipment. The only rights the hospital acquired in the equipment were derived from the lease. Given these facts, we hold that for purposes of the use tax Continental acquired title to and ownership of the equipment from the manufacturers and that the hospital never took title. There is no dispute but that the sale by the manufacturers, whether to Continental or to the hospital, was a sale at retail.

■ Upon delivery Continental became the owner and lessor of the equipment. The law is clear that the owner-lessor of property is the "user" of the property within the meaning of the Use Tax Act. (*Telco Leasing, Inc. v. Allphin* (1976), 63 Ill. 2d 305, 347 N.E.2d 729;

*Philco Corp. v. Department of Revenue* (1968), 40 Ill. 2d 312, 239 N.E.2d 805; *International Business Machines Corp. v. Department of Revenue* (1962), 25 Ill. 2d 503, 185 N.E.2d 257.) In *Telco* a company engaged in the business of leasing medical equipment to hospitals, laboratories and other research institutions protested a use tax delinquency which had been assessed against it. The company argued that it merely leased equipment to the hospital and that the hospital was the actual user of the equipment. The court rejected this argument, stating that " '[a] mere lessee does not exercise over the property any rights or powers incident to the ownership of the property.' " (63 Ill. 2d 305, 310.) The court noted that the term "use" in its statutory sense encompasses the utilization of property for profit-making purposes by means of leasing. 63 Ill. 2d 305, 310.

■ In *Telco* the hospital issued its purchase orders to the leasing company which then purchased the equipment from the manufacturers. The equipment was delivered to and accepted by the hospital so that the leasing company never actually took physical possession. Continental argues that *Telco* is distinguishable from the instant case because in *Telco* the hospital issued its purchase orders to the leasing company while here the hospital issued them to the manufacturers. Given the fact, however, that in both *Telco* and the instant case the leasing companies purchased the equipment from the manufacturers and exercised dominion over such equipment, we do not believe that the difference in the method of issuing purchase orders is significant. In accordance with *Telco* we hold that Continental as owner-lessor of the equipment is liable for the use tax delinquency assessed against it.

Since we have concluded that Continental acquired title to the equipment from the manufacturers, we need not consider the question whether the hospital's purported sale of such equipment to Continental was a taxable transaction.

For the foregoing reasons we reverse the judgment of the trial court.

Reversed.

STAMOS, P. J., and HARTMAN, J., concur.