Posner, Chief Judge.
 

 This bankruptcy appeal has a complicated procedural history that we shall ignore; the curious are referred to 151 B.R. 989 (Bankr.N.D.Ill.1992); 179 B.R. 532 (N.D.Ill.1994), and 202 B.R. 429 (Bankr.N.D.Ill.1996). All that matters is that the bankruptcy court eventually disallowed Illinois’s claim against the debtor’s estate for some $900,000 in unpaid Illinois use tax (including interest), Ill.Rev.Stat. ch. 120, ¶ 439.12 (1989), which was owed on the purchase of a corporate aircraft. The current statute, 35 ILCS 105/12, has a narrower scope, but we shall cite to it because the provisions that we discuss are materially the same. The district court affirmed the disallowance, precipitating this appeal by the state against the trustee in bankruptcy.
 

 The plane had been bought by Chandler Enterprises, Inc., an Illinois company now defunct, of which Stoecker was president. The state claims that Stoecker is liable for the tax as a “responsible officer” of Chandler. 35 ILCS 735/3-7. If this is right, the liability is a debt of the estate in bankruptcy.
 

 Chandler had asked Jack Prewitt & Associates (JPA), an established buyer and seller of corporate jets, to find one for it. JPA located a suitable jet that was for sale by Bezwada Investments and agreed with Chandler to broker the purchase. But Chandler did not have the cash to pay the plane’s full purchase price, which was in excess of $12 million, right away; so JPA turned to an affiliate, Prewitt Leasing, Inc. (PLI), which does airplane leasing and financing, for help with the sale. JPA bought the plane from Bezwada and transferred the title from itself to PLI. PLI then entered into an “Aircraft/Lease Purchase Agreement” with Chandler under which Chandler agreed to pay PLI $2.4 million immediately to be “applied to the final purchase price of the aircraft” and $10 million more (plus interest denominated “lease payments” on the $10 million) in 90 days if it decided to buy. Until the purchase option was exercised, title would remain in PLI, but during the 90-day option period, Chandler would have the full use of the plane and indeed could modify it as it saw fit. In June 1988, Chandler took delivery of the plane and transported it to Illinois and in September it exercised the option and PLI transferred title to it. Thus the transaction was Bezwada-JPA-PLI-Chandler.
 

 The Illinois use tax is a sales-tax substitute imposed on Illinois residents (which Chandler is conceded to be, or rather to have been, since it is now defunct) who buy from out-of-state sellers. If the seller doesn’t pay the tax, the buyer must file a return and pay the tax and in the case of aircraft the return must be filed and the tax paid within 30 days after the aircraft enters the state. 35 ILCS 105/10. When no return is filed — and Chandler filed no return — the Illinois Department of Revenue determines the amount of tax due and issues a Notice of Tax Liability to the taxpayer. 35 ILCS 105/12, 120/4. Unless the taxpayer protests the notice within the time provided, it become a final assessment although it is still subject to judicial review in the Illinois circuit court. 35 ILCS 12%, 12.
 

 The taxpayer may not be the only one liable for a tax. Under Illinois law, any corporate officer “who has the control, supervision or responsibility of filing returns and making payment of the amount of any ... tax ... who willfully fails to file the return or make the payment ... shall be personally hable for a penalty equal to the total amount of tax unpaid by the [corporation].” 35 ILCS 735/3-7. The Department determines the penalty, and its determination is “prima facie evidence of a penalty due.”
 
 Id.
 
 It embodies this determination in a Notice of Penalty Liability
 
 *549
 
 which is sent to the officer. The procedures for challenging a Notice of Penalty Liability are similar to those for challenging a Notice of Tax Liability.
 

 Chandler not only failed to file a use-tax return; it failed to register the plane with the Illinois Department of Aviation, as it was required to do. As a result, it took the Department of Revenue years to discover that Chandler owed use tax and by that time the company was defunct and Stoecker, its president, was in bankruptcy. The Department issued both a Notice of Tax Liability, futilely, against Chandler and a Notice of Penalty Liability against Stoecker.
 

 There are two principal issues. The first, which the district court resolved in favor of the state, is whether Chandler owed use tax on the purchase of the plane. The second, which the court resolved in favor of the trustee, is whether, if Chandler did owe use tax, Stoecker is liable for that tax as a responsible officer. Since Chandler, now a ghost, cannot pay the tax, the court’s second ruling spelled defeat for the state. The trustee defends the second ruling but attacks the first, arguing that no use tax was owed, in which event Stoecker had no responsible-officer liability regardless.
 

 The district court thought itself and the bankruptcy court barred by the Tax Injunction Act, 28 U.S.C. § 1341, from reexamining Chandler’s liability for use tax. The Act forbids federal courts to enjoin the assessment or collection of state taxes unless the taxpayer has no adequate remedy in the state courts. But Illinois is not trying to extract taxes from Chandler. It is trying to get a penalty in lieu of taxes from Stoecker’s estate in bankruptcy. Its right to do so depends on whether Chandler owed use tax, and the district judge thought that a federal court cannot decide an issue of state tax law. That is incorrect. The Bankruptcy Code expressly authorizes bankruptcy courts to decide tax issues, 11 U.S.C. § 505(a)(1), and although
 
 state
 
 taxes are not specified, the courts have interpreted the statute to cover them.
 
 Adams v. Indiana,
 
 795 F.2d 27, 29 (7th Cir.1986);
 
 City Vending of Muskogee, Inc. v. Oklahoma Tax Comm’n,
 
 898 F.2d 122, 128-24 (10th Cir.1990) (per curiam). The Act is anyway addressed only to injunctive remedies (or a declaratory judgment viewed as a preliminary to an injunction,
 
 National Private Truck Council, Inc. v. Oklahoma Tax Comm’n,
 
 515 U.S. 582, 586, 115 S.Ct. 2351, 132 L.Ed.2d 509 (1995)), and no one is seeking an injunction against the state’s going after Chandler for the taxes that the state believes Chandler owes it. If federal courts could not determine the debtor’s liability for state taxes— if they had to abstain pending a determination of that liability in state court— bankruptcy proceedings would be even more protracted than they are.
 

 So we can consider the trustee’s argument against that liability, and it is that PLI’s sale of the aircraft to Chandler was an “isolated or occasional sale of tangible personal property at retail by a person who does not hold himself out as being engaged (or who does not habitually engage) in selling such tangible personal property at retail.” 35 ILCS 105/2. An example would be a good bought at a garage sale; no use tax would be due. See 86 Ill. Admin. Code § 130.110(b) (1991); cf.
 
 Knowledge Data Systems v. Utah State Tax Comm’n,
 
 865 P.2d 1387 (Utah App.1993);
 
 Nevada Tax Comm’n v. Bernhard,
 
 100 Nev. 348, 683 P.2d 21 (1984) (per curiam).
 

 PLI, unlike its affiliate JPA, was not engaged in the regular sale of aircraft at retail (or at wholesale, for that matter). In fact the sale to Chandler was apparently the first sale of an aircraft that PLI had made. The trustee thus wants us to confine our attention to the transfer of title from PLI to Chandler. But that would be myopic. PLI is the financing arm of JPA, which is a retailer of aircraft. JPA found the plane for Chandler, took title to it from its previous owner, Bezwada, and brought
 
 *550
 
 PLI in to finance Chandler’s purchase of it. Bezwada was (so far as we can tell) not a retailer. But JPA was and it acted as the intermediary in the sale to Chandler, at one point actually holding title, as in the ordinary retail sale where the retailer buys from a supplier and resells to a consumer. The fact that title passed from the retailer to its affiliate before coming to rest with Chandler did not make PLI the real seller. Otherwise transactions would be easily structured to avoid use tax by having an out-of-state retailer transfer title to its nonretailer affiliate for retransfer to the in-state purchaser. The “substance over form” doctrine of tax law, on which see
 
 Gregory v. Helvering,
 
 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596 (1935);
 
 Segal v. Commissioner,
 
 41 F.3d 1144, 1148 (7th Cir.1994);
 
 Yosha v. Commissioner,
 
 861 F.2d 494 (7th Cir.1988);
 
 ACM Partnership v. Commissioner,
 
 157 F.3d 231, 246-47 (3d Cir.1998), would presumably allow the state to defeat the bankruptcy trustee’s attempt to invoke the “isolated or occasional sale” exemption by recharacterizing the transaction as a sale by JPA to Chandler. Cf.
 
 Continental Illinois Leasing Corp. v. Department of Revenue,
 
 108 Ill. App.3d 583, 64 Ill.Dec. 189, 439 N.E.2d 118 (1982).
 

 But this analysis is incomplete, because there is another and equally good way of playing “substance over form” in this case, and that is to treat the “real” sale as Bezwada to Chandler, with JPA and PLI holding title merely as security for financing the sale. See UCC §§ 1-201(37), 9-102, 810 ILCS 5/1-201(37), 5/9-102;
 
 Orix Credit Alliance, Inc. v. Pappas,
 
 946 F.2d 1258 (7th Cir.1991);
 
 Tilghman Hardware, Inc. v. Larrimore,
 
 331 Md. 390, 628 A.2d 215 (1993). This particular application of the “substance over form” doctrine, however, is nixed by Illinois law, which expressly treats a transfer of title to a retailer as a sale even if the purpose is merely to grant a security interest. 86 Ill. Admin. Code § 130.1060(a); Illinois Dept. of Revenue Private Letter No. 92-0113, 1992 WL 154376 (Feb. 27, 1992). JPA took title; JPA is a retailer; therefore use tax was due on the subsequent transfer of title by JPA to Chandler.
 

 So Chandler was liable for the tax and the next question is whether Mr. Stoecker was liable too, under the “responsible officer” rule. The record contains no evidence about the structure, scale, or operations of Chandler — even about what business it was engaged in — except that we do know that it had an officer named Pluhar who acted as the company’s financial officer. There is no evidence concerning Stoecker’s role in the filing of Chandler’s tax returns or the payment of any taxes due, and so no proof either that he was responsible for these corporate functions or that he willfully evaded the payment of the use tax. But just as under the corresponding federal law of responsible-officer liability for unpaid taxes, 26 U.S.C § 6672;
 
 United States v. Running,
 
 7 F.3d 1293, 1297 (7th Cir.1993);
 
 United States v. McCombs,
 
 30 F.3d 310, 318 (2d Cir.1994), Illinois shifts the burden of proof — both production and persuasion — to the officer once a Notice of Penalty Liability is issued,
 
 Branson v. Department of Revenue,
 
 168 Ill.2d 247, 213 Ill.Dec. 615, 659 N.E.2d 961, 968 (1995); and the trustee has not carried it. He may have satisfied his burden of production by identifying Pluhar as Chandler’s corporate financial officer, but he has not satisfied the burden of persuasion. Stoecker was the president and as far as we know he and Pluhar were the only officers and both deeply involved in the tax affairs of their corporation.
 

 It is true that, just as under the corresponding federal law,
 
 Wright v. United States,
 
 809 F.2d 425, 427 (7th Cir.1987), the failure to pay must be willful, implying at least gross negligence.
 
 Branson v. Department of Revenue, supra,
 
 659 N.E.2d at 965. Chandler had an opinion letter from a reputable lawyer that no tax was due because JPA really had just a security interest; and reliance on a reputable lawyer’s opinion letter can negate willfulness,
 
 *551
 

 Marrin v. Commissioner,
 
 147 F.3d 147, 152 (2d Cir.1998); cf.
 
 Hall v. Aqua Queen Mfg., Inc.,
 
 93 F.3d 1548, 1555 (Fed.Cir.1996);
 
 Westvaco Corp. v. International Paper Co.,
 
 991 F.2d 735, 743-44 (Fed.Cir.1993), though it’s not an automatic safe harbor.
 
 Marrin v. Commissioner, supra,
 
 147 F.3d at 152-53;
 
 O’Connor v. United States,
 
 956 F.2d 48, 52 n. * (4th Cir.1992);
 
 Smith v. United States,
 
 894 F.2d 1549, 1554 (11th Cir.1990). But no evidence was presented that Stoecker ever saw the letter, let alone that he relied on it. There is no other evidence bearing on the issue of willfulness.
 

 So the burden of proof is critical, and the trustee argues that whatever the rule under state law, the burden is on the state when the issue of responsible-officer liability is adjudicated in a bankruptcy proceeding. This shift is necessary, he contends, to promote “equality” among creditors in bankruptcy. Bankruptcy is an equitable procedure, and “equality is equity” (and vice versa),
 
 Cunningham v. Broum,
 
 265 U.S. 1, 13, 44 S.Ct. 424, 68 L.Ed. 873 (1924);
 
 Scott v. Armstrong,
 
 146 U.S. 499, 511, 13 S.Ct. 148, 36 L.Ed. 1059 (1892);
 
 United States v. Real Property,
 
 89 F.3d 551, 554 (9th Cir.1996);
 
 Downriver Community Federal Credit Union v. Penn Square Bank,
 
 879 F.2d 754, 761 (10th Cir.1989);
 
 White v. Carolina Paperboard Corp.,
 
 564 F.2d 1073, 1087 (4th Cir.1977), as numerous bankruptcy cases intone. E.g.,
 
 In re Elcona Homes Corp.,
 
 863 F.2d 483, 484 (7th Cir.1988);
 
 In re Joliet-Will County Community Action Agency,
 
 847 F.2d 430, 434 (7th Cir.1988). These truisms have a particular appeal for those bankruptcy judges who would like to administer the bankruptcy laws in accordance with their personal notions of fairness. But it is now well settled that although the origins, procedures, and many of the remedies of bankruptcy are indeed equitable, a bankruptcy judge has no authority to cut down the entitlements that creditors seek to enforce in bankruptcy, except (see, e.g.,
 
 United States v. Whiting Pools, Inc.,
 
 462 U.S. 198, 103 S.Ct. 2309, 76 L.Ed.2d 515 (1983)) as provided by the Bankruptcy Code itself.
 
 United States v. Noland,
 
 517 U.S. 535, 543, 116 S.Ct. 1524, 134 L.Ed.2d 748 (1996);
 
 Butner v. United States,
 
 440 U.S. 48, 55-56, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979);
 
 In re Carlson,
 
 126 F.3d 915, 920 (7th Cir.1997);
 
 In re FBN Food Services, Inc.,
 
 82 F.3d 1387, 1396 (7th Cir.1996);
 
 In re Lapiana,
 
 909 F.2d 221, 223 (7th Cir.1990);
 
 In re Landbank Equity Corp.,
 
 973 F.2d 265, 271 (4th Cir.1992).
 

 Bankruptcy is not a “free-for-all equity balancing act.”
 
 In re Lapiana, supra,
 
 909 F.2d at 224. It is a forum in which creditors prove the entitlements that state or federal law confers on them, and these entitlements are then enforced consistently with the provisions of the Code governing preferences, priority, and other issues that arise in the marshaling and collection of debts from a bankrupt debtor. An equity free-for-all would engender confusion and uncertainty and increase the strategic incentives to petition for bankruptcy either of debtors, if the bankruptcy court curtailed entitlements, or of creditors, if it expanded them. The closest to the power here asserted of a free-wheeling equitable discretion to cut down entitlements when they are sought to be enforced in a bankruptcy proceeding is the power of equitable subordination. 11 U.S.C. § 510. But it must be exercised case by case and not over a whole class of claims.
 
 United States v. Reorganized CF & I Fabricators of Utah, Inc.,
 
 518 U.S. 213, 228-29, 116 S.Ct. 2106, 135 L.Ed.2d 506 (1996);
 
 United States v. Noland, supra,
 
 517 U.S. at 543, 116 S.Ct. 1524; cf.
 
 In re Envirodyne Industries, Inc.,
 
 79 F.3d 579, 581 (7th Cir.1996).
 

 Burden
 
 of
 
 proof is rightly classified as a part of the creditor’s entitlement, implying that it is not shifted in bankruptcy.
 
 In re Landbank Equity Corp., supra,
 
 973 F.2d at 270, so holds, though
 
 In re Macfarlane,
 
 83 F.3d 1041, 1045 (9th Cir.1996), is to the contrary. We acknowl
 
 *552
 
 edged the division of authority in
 
 In re Carlson, supra,
 
 126 F.3d at 921, without having to choose. Today we choose, and we choose
 
 Landbank.
 
 It is supported by the general pattern of American tax law, in which “payment precedes defense, and the burden of proof, normally on the claimant, is shifted to the taxpayer,”
 
 Bull v. United States,
 
 295 U.S. 247, 260, 55 S.Ct. 695, 79 L.Ed. 1421 (1935), and by the countless cases which hold that burden of proof is “substantive” for purposes of the
 
 Erie
 
 doctrine, e.g.,
 
 Director v. Greenwich Collieries,
 
 512 U.S. 267, 271, 114 S.Ct. 2251, 129 L.Ed.2d 221 (1994);
 
 American Dredging Co. v. Miller,
 
 510 U.S. 443, 454, 114 S.Ct. 981, 127 L.Ed.2d 285 (1994);
 
 Dick v. New York Life Ins. Co.,
 
 359 U.S. 437, 446, 79 S.Ct. 921, 3 L.Ed.2d 935 (1959);
 
 Koppers Co. v. Aetna Casualty & Surety Co.,
 
 98 F.3d 1440, 1446 (3d Cir.1996), in recognition of the critical importance of burden of proof to a person’s rights. Illinois has given its taxing authorities an entitlement to collect a penalty tax pursuant to a Notice of Penalty Liability that is defeasible only if the taxpayer can persuade the adjudicator that the tax is not due. That is different from an entitlement to collect the taxes listed in the notice upon proof by the state that the tax is due. On the latter interpretation, the Notice of Penalty Liability really is just a notice, conferring no rights, adding nothing to the Notice of Tax Liability; on the former view, which seems to us the sound view, the Notice of Penalty Liability creates a defeasible right.
 

 Congress can alter entitlements in bankruptcy, and sometimes does so, but there is no indication that it meant to shift the burden of proof from taxpayer to tax collector. Rather the contrary. The Code itself grants a favored position to claims of unpaid taxes, 11 U.S.C. §§ 507(a)(8), 523(a)(1) (we’re about to see another example); and the close attention that the drafters of the Code paid to issues of burden of proof, e.g., 11 U.S.C. §§ 362(g), 363(o), 364(d)(2), 547(g), 1129(d), makes their silence on the burden of proof in tax cases eloquent. The position for which the trustee contends has no more basis in the Code than in the law of Illinois, and it would create a new incentive to declare bankruptcy. We have enough bankruptcies.
 

 The last string to the trustee’s bow is the argument that the state’s tax claim was untimely. Bankruptcy Rule 3002(c) requires, with immaterial exceptions, that a proof of claim be filed with the bankruptcy court within 90 days after the first date set for the meeting of creditors, which in this case would have been by June 26, 1990. See also Bankr.R. 9006(b)(3). The state’s claim was not filed until 18 months later and it was therefore untimely. But in a conflict between the Code and the rules, the Code controls, 28 U.S.C. § 2075;
 
 In re Pacific Atlantic Trading Co.,
 
 33 F.3d 1064, 1066 (9th Cir.1994), and it permits — without even a loss of priority — the filing of certain untimely claims (other than by the debtor,
 
 In re Danielson,
 
 981 F.2d 296 (7th Cir.1992)), including the state’s tax claims in this case. See 11 U.S.C. §§ 507(a)(8)(E), 726(a)(1). This is crystal clear under the current version of section 726(a)(1), but was clear enough under the old version, e.g.,
 
 Cooper v. Internal Revenue,
 
 167 F.3d 857 (4th Cir.1999), the one applicable to this suit, though some courts disagreed. See cases cited in
 
 id.
 
 at 859.
 

 The exception for instances of inexcusable delay, in which the tardy claim may be equitably subordinated to timely claims, 11 U.S.C. § 726(a) (incorporating § 510), is not available to Stoecker. Chandler’s failure to register the aircraft or file a tax return prevented the state from discovering Stoecker’s liability until long after the bankruptcy proceeding was commenced, an express purpose of the requirement of registration being to make sure that “all applicable fees and taxes shall be paid.” 620 ILCS 5/42.
 

 We conclude that the state has a valid claim against Stoecker’s estate and that
 
 *553
 
 the decision of the district court must therefore be reversed.
 

 We wish in closing to commend counsel for both parties (Benjamin Goldgar for the state and Robert Radasevich for the trustee) for their excellent briefs and argument. REVERSED AND REMANDED.